No. 29,462.

HENRY MELLIES, *Appellee*, v. DAVID HEILMAN, *Appellant*.

(289 Pac. 421.)

Opinion filed July 5, 1930.

*Oscar E. Peterson* and *W. T. Roche,* both of Clay Center, for the appellant.
*William A. Smith* and *Walter T. Griffin,* both of Topeka, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This is an action on a promissory note for $9,000. The jury answered special questions and returned a verdict for plaintiff. Defendant has appealed.

The plaintiff, Henry Mellies, a farmer in Clay county, became interested in oil developments in and about Lost Springs and obtained a lease on what is known as the "Church property." He entered into a contract with Lawrence Beck to drill a well on this Church lease and paid him $5,000 in cash, assigned to him a three-eighths interest in the lease, and agreed to pay an additional $2,500 when the well was completed. Beck proceeded to drill the well. The defendant, David Heilman, a well-to-do farmer, had made investments in oil leases or shares, some of them in and about Lost Springs. Beck, through J. H. Holt, an agent he had employed for that purpose, had sold to defendant a one-sixteenth interest in the Church lease for $2,750.

Thereafter, and in August, 1928, Beck desired to sell more of his interest in the lease. He and Holt met defendant in an alfalfa field, where they had one Ben Hughes make an appointment with the defendant for them. They wanted to sell defendant an additional three-sixteenths interest in the Church lease, and after talking awhile defendant agreed to buy the three-sixteenths interest in the lease for $9,000, and executed his note, due in six months, for that amount. Before going out to see defendant, Beck, or Holt for him, had talked with some of the officials of the Union State Bank at Clay Center about taking defendant's note, and, expecting the bank to take it, they had the note made payable directly to the Union State Bank. After the note had been executed, Beck, or Holt for him, took the note to the Union State Bank, but the amount of it was larger than expected and the bank declined to take it. Beck and Holt, through Ben Hughes, then got in touch with the plaintiff Mellies and offered to sell him the note, and to induce him to purchase it offered to take an assignment of a one-sixteenth interest in the lease from plaintiff in part payment. Mellies went to Morganville and talked with J. G. Hughes, cashier of the Farmers and Merchants Bank there, where he did business, and learned that the defendant was regarded as financially responsible. He then told Beck and Holt that he would buy defendant's note provided it was satisfactory to defendant for him to take the note and for his name

to be written into it as payee. He asked J. G. Hughes to see defendant and find out if that would be satisfactory. J. G. Hughes, in company with Beck and Holt, went to see the defendant, and as a result of a consultation with him the name of the plaintiff was inserted as payee in the note in lieu of the Union State Bank. Thereafter plaintiff paid to Beck $6,000, less an interest item, and assigned a one-sixteenth interest in the oil-and-gas lease on the Church property. It appears that the understanding was that the assignments were to be left at the Farmers and Merchants Bank at Morganville, and they were recorded some two or three months later. These consisted of an assignment from Beck to defendant of a two-sixteenths interest in the Church lease and the assignment from plaintiff of a one-sixteenth interest. When recorded, both assignments contained the name of the defendant as the assignee; but it is not clear from the record whether the assignment from plaintiff was blank as to assignee at the time he delivered it to Beck, or whether it had defendant's name in it at that time. Beck completed the drilling of the well on the Church lease, but it produced no oil to speak of. It therefore developed that the lease became of little value.

The defenses pleaded were that defendant had been induced by fraudulent representations to execute the note, and that there was a fraudulent alteration of the name of the payee. The fraudulent representations which defendant alleged were made to him, which induced him to sign the note in question, were statements of Beck and Holt which he testified were made to him in the alfalfa field on the day he signed the note. They were: (1) That the oil wells which had been completed in the Lost Springs territory, and which were located in the immediate vicinity of the Church lease on which Beck was drilling a well for plaintiff, were producing from 200 to 300 barrels of oil per day; (2) that the three-sixteenths interest in the Church lease which they were offering to sell defendant was worth the sum of $9,000; and (3) that they had sold for defendant a two-sixteenths interest owned by defendant in an oil lease on a block a short distance from the Church lease for the sum of $16,000, upon which there was then a producing well, that the deal for that sale was just about completed, and that if defendant purchased the three-sixteenths interest in the Church lease for $9,000 they would obtain for defendant $16,000 for the interest he owned in the other lease. The evidence respecting these alleged

false representations was decidedly conflicting. In answer to special questions the jury found that there was an agreement between the plaintiff and Lawrence Beck that plaintiff was to furnish a part of the consideration for the $9,000 note and that he did furnish a one-sixteenth interest in the lease; that the note sued upon had been changed or altered after it had been executed by defendant, by inserting the name of Henry Mellies as payee in lieu of the Union State Bank, the original payee named; that J. H. Holt procured the change or alteration to be made and wrote the name "Henry Mellies" as payee in the note; that defendant consented to this change or alteration and that the same was made in his presence, and that plaintiff when he took the note relied upon defendant's consent that he should purchase it; that plaintiff took the note in good faith without notice or knowledge of any infirmity or defect in the note or knowledge of any facts that made his taking the note amount to bad faith, and that he paid a valuable consideration therefor. The jury was specifically asked, "Was the note sued upon obtained by fraud?" and its answer was "No."

All of these findings are sustained by an abundance of evidence which it will not be necessary to set out at length. With respect to the principal defense pleaded—fraud which induced the execution of the note—it may be said that the testimony of the defendant as to fraud was not very strong and such of it as tended to show fraud was explained or controverted by other witnesses. Hence on that point the jury's finding is well supported.

Appellant complains of an instruction in which the court told the jury that before the defense of fraud could prevail in this case it must be shown that plaintiff made or caused to be made the fraudulent representations alleged in the answer as inducing the execution of the note. We see no error in this instruction, but in view of the jury's finding that the note was not obtained by fraud the point raised on this instruction becomes immaterial, for in no event could plaintiff be charged with fraud which never existed. This reasoning disposes of another argument made by appellant, namely, that plaintiff, having furnished a part of the consideration which passed to defendant for the note, was bound by the fraudulent representations made by Beck and Holt when they obtained the note, although he had no knowledge or notice of them.

Appellant contends that the court erred in overruling his demurrer to plaintiff's evidence for the reason that the note was void

under the statute (R. S. 17-1219), which provides, in substance, that it shall be unlawful for any person to take a note for which "the shares of capital stock of any corporation, or the units or shares of any association, syndicate or common-law trust, or any interest of any kind in any such corporation, association, syndicate or common-law trust, shall form the whole or any part of the consideration," unless, before the note is signed by the maker, the person taking the same shall insert in the face thereof, above the signature, the words, "Given for shares in ——," or units, or interest in, as the case may be. R. S. 17-1220 provides that such a note shall be nonnegotiable. It is argued that a compliance with the statute requires that the note sued upon should have had inserted on the face of it, "Given for a three-sixteenths interest in oil lease," or words of similar import, and that the lack of these words rendered the note void, citing *Fidelity State Bank v. Evans*, 129 Kan. 199, 282 Pac. 591, and allied cases. This point was not raised in the court, and for that reason we might with propriety decline to pass on it (*Emerson v. Peters*, 110 Kan. 87, 202 Pac. 601; *Fidler v. Short*, 118 Kan. 37, 233 Pac. 1022; *Blomberg v. State Bank*, 119 Kan. 691, 241 Pac. 242). But, considering the point, it appears not to be well taken. It is not contended the note was given for the shares of the capital stock of a corporation or for the units or shares of any syndicate or common-law trust. Appellant contends that the manner in which plaintiff and Beck were associated together in drilling the well made them an association within the meaning of the statute. This contention cannot be sustained. In 5 C. J. 1333, in defining the term "association," it is said:

"As the term is commonly used, however, an 'association' may be defined to be a body of persons acting together, without a charter, but upon the methods and forms used by incorporated bodies, for the prosecution of some common enterprise."

A similar definition is given in Bouvier's Law Dictionary. See, also, *Alyea-Nichols Co. v. United States*, 12 F. (2d) 998-1004. The relations between plaintiff and Beck do not come within that definition. Plaintiff had obtained the lease on the Church property and owned it in its entirety. He made a contract with Beck for the drilling of a well. Beck's relations to plaintiff were those of an independent contractor. The fact that by his contract for drilling the well he became the owner of a certain share of the lease, a portion of which he had previously sold to the defendant in this case,

did not make all of the parties owning an interest in this lease constitute an association. They had no common purpose for which they were contributing funds, but were owners respectively of separate and individual interests in the lease.

The judgment of the court below is affirmed.